**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

ELISA GANCERES,

        Plaintiff,

vs.                                                                   Case No. 3:04-cv-199-J-32HTS

CINGULAR WIRELESS HEALTH
AND WELFARE BENEFITS PLAN FOR
NON-BARGAINED EMPLOYEES, etc., et al.,

        Defendants.

_____

**ORDER**[1]

This case is before the Court on Plaintiff Elisa Ganceres' Motion for Summary Judgment (Doc. 73) and Defendants Cingular Wireless Health and Welfare Benefit Plan for Non-Bargained Employees and Metropolitan Life Insurance Company's Motion for Final Judgment Based on Review of Administrative Record (Doc. 62). Plaintiff and defendants filed memoranda in opposition to the cross motions (Docs. 76 & 77). The Court held oral argument on August 7, 2006 in conjunction with the related case, Brandy Snider v. Cingular Wireless Health and Welfare Benefit Plan for Non-Bargained Employees and Metropolitan Life Insurance Company, 3:04-cv-198-J-32MMH. (Doc. 80).

---

[1] Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

## I.     PROCEDURAL HISTORY

On March 18, 2004, plaintiff Elisa Ganceres ("Ganceres") filed suit under 29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA") essentially seeking short term disability ("STD") and long term disability ("LTD") benefits under the Cingular Wireless Health and Welfare Benefits Plan for Non-Bargained Employees, which is administered by Metropolitan Life Insurance Company ("MetLife") (collectively "defendants").  (Doc. 1).  During this case, United States Magistrate Judge Marcia Morales Howard issued a Report and Recommendation concerning whether defendants' decision finding Ganceres ineligible for long term disability benefits for failing to exhaust short term disability benefits is arbitrary and capricious.  (Doc. 40).  Judge Howard found that the Administrator was not arbitrary and capricious in interpreting the Plan language to require a Plan participant to exhaust short term disability benefits before becoming eligible for consideration for long term disability benefits.  (Id.).  Ganceres filed several objections to Magistrate Judge Howard's conclusions regarding the Plan language. (Doc. 48).  Upon review, the undersigned determined not to act on Magistrate Judge Howard's Report and Recommendation primarily because a decision concerning Ganceres' entitlement to STD benefits remained an issue in the case that had yet to be determined.  (Snider Doc. 56).[2]  Now, this case is before the Court on cross

---

[2] The Order deferring ruling on the objections to Magistrate Judge Howard's Report and Recommendation was filed in the companion Snider case only, but applies to both the Snider and Ganceres cases. References to that Order are

-2-

dispositive motions and Ganceres' objections to the Magistrate Judge's Report and Recommendation.

## II.     BACKGROUND

### A.     The Plan and Defendants

Cingular Wireless self-funds its Short Term Disability ("STD") benefits and insures the Long Term Disability ("LTD") benefits through MetLife. (Doc. 65-8, Plan at p. 35 (10.1)).  The Administrator of the Plan is the Administrative Committee of Cingular Wireless ("Administrative Committee"). (Doc. 65-7, Plan at p. 22 (7.5); Doc. 65-3, Summary Plan Description ("SPD") at p. 15).  The express Plan language delegates "absolute discretion" to the Administrative Committee to administer the Plan, interpret the Plan and make benefit entitlement determinations. (Doc. 65-7, Plan at p. 22-23 (7.7)).  The Administrative Committee, in turn, delegates this authority to MetLife. (Id. at p. 4 (1.27), 22 (7.5); Doc. 65-8 at p. 35 (10.1); Doc. 65-3, SPD at p. 13, 15).  Thus, MetLife administers both the STD and LTD benefits. (Id.).

There is a two-tiered process for obtaining disability benefits under the Plan. The first is for STD benefits.  A disabled employee can obtain STD benefits for twenty-six weeks, and, depending upon the length of employment, up to 100% of their pay during this twenty-six week period. (Doc. 65-2, SPD at p. 2).[3]  The second tier

---

denoted as "Snider Doc. 56."

[3] The SPD sets forth the graduations concerning the duration STD benefits are payable at 100% of an employee's basic rate of pay and that which are payable at 60% of an employee's basic rate of pay.  To obtain STD benefits at 100% of the basic

of disability benefits is LTD benefits and commence for a disabled employee when the STD benefits are exhausted and pay fifty percent of an employee's basic rate of pay until the age of 65.  (Id. at p. 4).

To obtain STD benefits, an employee must meet the definition of "Total Disability," which is:

> Total Disability for STD benefits means that due to an illness or injury you are unable to perform your customary job or another available job assigned by your Company with the same full- or part-time classification for which you are reasonably qualified.

(Id. at p. 3).

The terms "Disability" or "Disabled" for LTD benefits mean:

> …[T]hat due to an illness or injury you are continuously unable to perform your customary job for the first (two) years of your initial date of Disability.  After (two) years, you must meet the definition of Total Disability to continue to receive Disability benefits under the Plan.

(Id. at p. 4).

The term "Total Disability" for LTD benefits means:

> [T]hat after (two) years from the date of your initial Disability, you are continuously prevented by your Disability from engaging in any employment for which you are qualified or may reasonably become qualified for based on education, training or experience.  As long as you remain Disabled based on this definition, you may receive LTD…benefits up to the maximum of age 65.

---

rate of pay, an employee must have thirteen years or more of Net Credited Service ("NCS") with Cingular Wireless.

-4-

(Id.).⁴  Further, to obtain STD and LTD benefits, a claimant must "present credible, objective medical evidence" of his or her "Disability."  (Id. at p. 10; Doc. 65-3 at p. 13-14).

### B. The Plaintiff

Elisa Ganceres, who is now fifty-two years old, was a customer service representative for Cingular Wireless.  On July 7, 2003, Ganceres informed MetLife that she was set to have surgery (a hernia operation). (A.R. 0161).  On July 24, 2003, MetLife received an Attending Physician Statement from plaintiff's physician Dr. Christian Oraedu (General Surgery), who performed the hernia operation.  (A.R. 0002-0004).  Dr. Oraedu checked "No" in response to the question "Have you advised patient to return to work?"; Dr. Oraedu also noted that Ganceres' condition should improve in six weeks.  (A.R. 0003).  In a letter dated July 31, 2003, MetLife initially approved Ganceres' STD benefits for the period spanning July 28, 2003 through August 13, 2003.  (A.R. 0010).  The letter also requested that plaintiff submit detailed medical records concerning her condition.  (Id.).

On August 12, 2003, Ganceres telephone MetLife and informed them that she had an MRI that showed "abnormalities" (a bulging disk between L4 and L5) and that

---

⁴ The original term of three years in the definitions of "Disability," "Disabled," and "Total Disability" was changed to two years in a modification after the Plan and Summary Plan Description originally issued.  (Doc. 65-3, Summary or Material Modification, p. 4).

-5-

she was seeking an appointment with a neurosurgeon. (A.R. 0167). MetLife informed Ganceres (as it had previously) to send updated medical records. (Id.).

On August 18, 2003, Ganceres called MetLife and informed it that she had returned to work that day. (Id.). Later that same week (August 21, 2003), Ganceres left work (apparently due to her ailment). (A.R. 0168). On September 3, 2003, MetLife sent a letter to Ganceres informing her that her STD benefits claim was under review and that her physician needed to submit certain medical information, including an Attending Physician Statement, office notes and diagnostic information, names and dosages of current medication and an expected return to work date. (A.R. 0011). MetLife stated that the requested information must be received by September 17, 2003 and that "[f]ailure to submit this information timely will result in closure of your claim." (Id.).

On September 15, 2003, Ganceres' treating physician, Anwar Khan, submitted the Supplemental Attending Physician Statement stating that Ganceres' diagnosis was "[left] leg pain and difficulty walking, mild spinal stenosis L4-5 L5-7 [left] side." (A.R. 0012-0014). Dr. Kahn noted that his most recent treatment date of Ganceres at that point was August 7, 2003. (A.R. 0012). Dr. Khan also noted that any improvement was "To be determined," and that Ganceres could return to work on September 25, 2003 in a part-time capacity. (A.R. 0013).

On September 23, 2003, MetLife sent a letter to Ganceres stating that her STD benefits were canceled as of even date and stated, in pertinent part:

-6-

> Your claim is being denied because there is no objective medical evidence to support your absence from work. We received an Attending Physician Statement (APS) to review for your claim. It listed a general diagnosis of leg pain. No objective medical evidence was sent to support disability due to a diagnosis of leg pain. Therefore your claim for short-term disability benefits is denied.

(A.R. 0016). The denial letter informed Ganceres of her right to appeal and that if the appeal was denied she could file suit under ERISA. (A.R. 0016).

On September 25, 2003, Ganceres called MetLife and informed it that she was seeing two physicians, but neither had taken her out of work. (A.R. 0173). Ganceres also advised that her neurosurgeon would not fill out her disability forms; MetLife advised Ganceres to appeal the denial and to send in her medical records from both physicians. (Id.).

On October 22, 2003, Ganceres, via her attorney, Terence J. Kann, sent three separate letters to MetLife. One letter merely advised MetLife that he represented Ganceres and asked MetLife to identify the Plan Administrator and if the disability benefits were offered pursuant to an ERISA Plan. (A.R. 0025). A second letter requested certain documents, including MetLife's claim file on Ganceres, a copy of the Plan or insurance policy, all records prepared by medical consultants, and claims procedures relied upon in making a determination on Ganceres' claim. (A.R. 0020-0022). A third letter concerns MetLife's proffered reason for denying Ganceres' claim for benefits after September 23, 2003 (i.e. that "there is no objective evidence to support [Ganceres'] absence from work") and requests that MetLife identify the portion of the Plan or policy that requires such "objective medical evidence," and, if

-7-

MetLife is unable to do so, either define "objective medical evidence" or state what type of "objective medical evidence" MetLife is looking for to support a claim. (A.R. 0026-0027).

With one of the October 22, 2003, letters (A.R. 0026-0027), Ganceres enclosed additional medical records. The records included: (1) a one page assessment performed by Dr. Mark Oliver dated September 8, 2003 discussing that an MRI of Ganceres' back revealed "some mild degenerative disc changes with lateral recess stenosis over the L4-5 and L5-S1 segments," and that "[Dr. Oliver] is not really sure she is a great surgical candidate, and would rather her try conservative measures first," such as a lumbar spine strengthening rehabilitation program (A.R. 0028); (2) the MRI result, which documented the disc problems with the L4-5 and L5-S1 discs (A.R. 0029); and (3) handwritten notes from Dr. Khan and his staff spanning March 17, 2003 through August 12, 2003 (A.R. 0030-0037).

Dr. Kahn saw Ganceres for the first time on March 17, 2003, when he examined her for chest pain. (A.R. 0037). The August 7, 2003 consult notes (Ganceres' last visit with Dr. Kahn according to the record) reference leg pain and difficulty walking. (A.R. 0030). There were no additional medical records submitted post-dating August 12, 2003.

On October 22, 2003, Ganceres' attorney issued a letter to Dr. Kahn informing him of his representation of Ganceres and noted that he had been unable to obtain from MetLife a definition of "objective medical evidence." (A.R. 0039-0040). In

response to three queries from Ganceres, Dr. Kahn responded that she had "moderate to severe left leg pain and … difficulty walking and was limping," which, together with the results of her MRI, provided "objective medical evidence" that Ganceres "is and has been temporarily disabled from working full-time." (Id.).

From October 30 through November 26, 2003, Ganceres and MetLife exchanged a spate of rather unproductive correspondence wherein Ganceres requested additional documents from MetLife (claiming that MetLife withheld certain documents responsive to his original request), and MetLife responded that it had provided all "non-privileged" documents to Ganceres. (A.R. 0041-0045). This culminated on November 26, 2003 with Ganceres filing a Civil Remedy Notice with the Florida Department of Insurance stating that MetLife had (1) refused to provide information related to Ganceres' disability claim, (2) failed to affirm coverage or provide a reasonable explanation for its denial and (3) failed to fully respond to Ganceres' inquiry concerning whether the policy at issue fell under ERISA . (A.R. 0046-0047).

On December 2, 2003, MetLife sent a letter to Ganceres "enclosing all medical information, outgoing correspondence and all received correspondence," which "constitute[d] the entire file for [Ganceres'] short-term disability claim." (A.R. 0049). Thereafter, spanning December 12, 2003 through February 16, 2004, Ganceres and MetLife exchanged a second spate of correspondence wherein Ganceres essentially accused MetLife of withholding additional information related to her STD benefits

claim, and MetLife assured Ganceres that (1) it had provided its entire claim file and (2) Cingular Wireless' STD benefit plan is self-insured and governed by ERISA. (See A.R. 0050-0063). Ganceres also inquired whether her original STD claim had been reviewed by an independent medical professional. (Id.).

Ultimately, on March 24, 2004, MetLife began processing Ganceres' appeal of the STD benefits denial. (A.R. 0064). On March 30, 2004, Ganceres, citing "lack of contact from MetLife," informed MetLife that she had filed a lawsuit and included a courtesy copy of it. (A.R. 0065). Ganceres, however, noted MetLife's March 24, 2004 letter and stated that she was willing to grant a forty-five day extension to answer the Complaint based on MetLife's representation that it was undertaking an independent review of Ganceres' appeal. (Id.).

On April 15, 2004, Dr. Janet L. Collins, Board Certified in Occupational and Environmental Medicine, performed an independent records review of Ganceres' file and prepared a report articulating her findings. (A.R. 0091-0096). First, Dr. Collins essentially recapitulated Ganceres' physician notes and other medical records spanning March 17, 2003 through September 15, 2003 (A.R. 0091-0095), as well as Dr. Kahn's response to Ganceres' inquiries dated October 27, 2003 (A.R. 0094). Then, Dr. Collins was posed the following two queries, to which her responses are set forth in pertinent part:

> 1.   Is the medical evidence available for review supportive of the (employees') inability to perform her job beyond 08/19/03? If so through what date?

-10-

> It appears as though on 07/24/03 a physician stated that she had undergone a repair of an incarcerated ventral hernia with mesh on 07/21/03. A six week postop period of disability would be reasonable at that time. Six weeks out from 07/21/03 would bring to 09/01/03. Disability should be approved through that period of time. The only clinical information I have available subsequent to that period of time is an evaluation done by Mark Oliver, M.D. done on 09/08/03. At that time she had a relatively unremarkable physical exam with the exception of mildly positive straight leg raising on the left. The remainder of her exam of her back and extremities was essentially unremarkable. ... There is no discussion in this note with regard to her being completely disabled for that period of time with respect to her job.
>
> 2.    Please comment on [employee's] functional capacity during the time period in review.
>
> It would appear for this six week postop period that she would have been considered totally disabled. ...The evaluation, which was done on 09/08 by Dr. Oliver failed to reveal any physical abnormalities. However, she does have an MRI that shows some minor disk protrusions at two levels in the lower lumbar spine. Because of this and because she does have some sensory symptoms in her left leg, I certainly do agree with Dr. Oliver that she should undergo an active rehabilitation program aimed at relieving any mechanical component of her back pain.

(A.R. 0095).

> Dr. Collins concluded that:
>
> In summary, I can find no objective data in the available medical records, which supports the existence of an impairment that would be considered totally disabling for the time period in question. The exception to this is the six week postoperative period after she had her ventral hernia repair. ...There were objective findings on her MRI, however these were not of a severe nature as to be considered totally disabling.

(A.R. 0096).

On April 30, 2003, MetLife sent a letter to Ganceres requesting an additional forty-five days to decide her appeal. (A.R. 0108). Shortly thereafter, however,

-11-

MetLife issued a letter to Ganceres' counsel and informed him that it decided to partially reverse its previous finding that STD benefits terminated on August 19, 2003, and extended the benefits to September 1, 2003, based on Dr. Collins' opinion. (A.R. 0109-0110). MetLife, however, denied STD benefits post-dating September 1, 2003. (Id.). Thereafter, Ganceres served her complaint, which seeks, inter alia, STD and LTD benefits.

### III.     DISCUSSION

#### A.     Procedural Mechanism for Review - Summary Judgment

"In an ERISA benefit denial case...in a very real sense, the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Curran v. Kemper Nat. Servs., Inc., 2005 WL 894840, *7 (11th Cir. 2005) (unpublished *per curiam* opinion) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002)); accord Clark v. Hartford Life and Accident Ins. Co., 2006 WL 890660, *2 (M.D. Fla. April 6, 2006) (unpublished opinion). "Where the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." Crume v. Met. Life Ins. Co., 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006) (quoting Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999)).

While MetLife posits that Rule 52, Federal Rules of Civil Procedure, addressing required findings by the Court subsequent to a bench trial, is the proper procedural mechanism to decide these ERISA cases, rather than the traditional standards associated with Rule 56, Federal Rules of Civil Procedure, this Court follows the Eleventh Circuit's discussion in the unpublished Curran[5] decision, which augments the traditional summary judgment rules as applied to review of ERISA benefit denial cases, yet still decides the case under Rule 56. As Judge Conway so aptly discussed in Crume:

> [W]here the ultimate issue to be determined is whether there is a reasonable basis for a claims administrator's benefits decision, it is difficult to ascertain how the 'normal' summary judgment rules can sensibly apply. After all, the pertinent question is not whether the claimant is truly disabled, but whether there is a reasonable basis in the record to support the administrator's decision on that point. In other words, conflicting evidence on the question of disability cannot alone create an issue of fact precluding summary judgment, since an administrator's decision that rejects certain evidence and credits conflicting proof may nevertheless be reasonable.

417 F. Supp. 2d at 1273. Thus, the proper method by which to review these ERISA benefit denial cases is as set forth in Curran and Crume, which essentially modify the traditional Rule 56 standard for ERISA disability benefits cases.

**B.    Applicable ERISA Standards**

Under ERISA, the plaintiff "has the burden of showing that [s]he is entitled to

---

[5] While it is true that the Eleventh Circuit's unpublished opinions are not binding authority and that reliance upon them alone is ordinarily disfavored, they are nevertheless persuasive. See 11th Cir. R. 36-2 and I.O.P. 6.

the 'benefits under the terms of [the] plan.'" Stvartak v. Eastman Kodak Co., 945 F. Supp. 1532, 1536 (M.D. Fla. 1996) (quoting 29 U.S.C. § 1132(a)) aff'd, 144 F.3d 54 (11th Cir. 1998); Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998).   ERISA provides no standard for reviewing decisions of plan administrators or plan fiduciaries.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989).  After Firestone, the Eleventh Circuit adopted three separate standards for reviewing administrators' plan decisions: "(1) *de novo* where the plan does not grant the administrator discretion [i.e., the administrator does not exercise discretion in deciding claims]; (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] ... [he has] ... a conflict of interest." Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1134-35 (11th Cir. 2004) (quoting HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001) (citation omitted)).

In Williams, the Eleventh Circuit recapitulated the applicable framework for analyzing "virtually all" ERISA plan benefit denials:

1. Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

2. If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

3. If the administrator's decision is "*de novo* wrong" and he was

-14-

>      vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> 4.   If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> 5.   If there is no conflict, then end the inquiry and affirm the decision.
>
> 6.   If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Id. at 1137-38.

Based on the "virtually all" language in Williams, it appears that the six step analysis applies in every ERISA long term disability benefits denial case. See Williams, 373 F.3d at 1137-38. The Williams court even footnoted this language and stated that "[w]e thus mean both benefits denials based on plan interpretations as well [as] on factual determinations, since many, if not most determinations will involve 'issues of both plan interpretation and fact,' ... and we will otherwise wait to be confronted by principled exception to say otherwise here." Id. at 1137, n. 6. Thus, one reading of Williams is that the Eleventh Circuit meant for the six step framework to apply to *all* ERISA cases, regardless of whether the administrator is vested with discretionary authority to determine eligibility for benefits or if there is a conflict of interest. In fact, the Eleventh Circuit so stated in one recent post Williams opinion. See Tippitt v. Reliance Standard Life Ins. Co., 457 F.3d 1227, 1232 (11th Cir. 2006) ("regardless of whether arbitrary and capricious review or the heightened form of that standard of review applies, the court reviews de novo the claims administrator's

-15-

interpretation of the plan to determine whether it is 'wrong'") (citation omitted).

Pursuant to Tippitt, the Court will begin with step 1 in Williams and assess whether the administrator was "wrong" to discontinue STD benefits after September 1, 2003, before proceeding with the remainder of the Williams analysis. In other words, before the Court undertakes the issues of whether the Plan properly grants discretionary authority to MetLife to determine entitlement to STD and LTD benefits, and whether MetLife operates under any conflict of interest in making either of these determinations, the Court will first decide whether MetLife's decision to terminate STD benefits as of September 1, 2003 was "wrong."

### C. Application to STD Benefits

MetLife ultimately declared Ganceres' entitlement to STD benefits expired on September 1, 2003. (A.R. 0109-0110). Plaintiff asserts that MetLife's failure to extend STD benefits past September 1, 2003 was wrong and unreasonable because the objective medical evidence, along with the subjective pain Ganceres suffered as a result of her maladies, indisputably supported a continuation of benefits. Defendants submit that Ganceres failed to show any entitlement to benefits after September 1, 2003, and that the objective medical evidence was consistent with a termination of STD benefits as of that date.

A review of Dr. Collins' April 15, 2004 report and the medical records submitted illustrate that MetLife was not "wrong" when, on appeal, it found that Ganceres was disabled from the date of her hernia surgery (July 21, 2003) through September 1,

2003, a period of six weeks post-operative.[6][7]  (A.R. 0091-0096).  The only diagnostic medical evidence post-dating September 1, 2003 addressing Ganceres' ailment is the September 8, 2003 assessment from Dr. Oliver who noted, inter alia, that Ganceres had some lumbar spine degenerative disc problems, normal muscle tone throughout her body and good strength in her lower extremities.  (A.R. 0028).  Dr. Oliver recommended a spine strengthening rehabilitation program, rather than any surgery, for Ganceres' low back pain.  (Id.).  The assessment does not discuss Ganceres as being precluded from working and overall illustrates a rather unremarkable examination.

Dr. Kahn's responses to Ganceres' counsel's letter dated October 22, 2003 are of limited utility in assessing Ganceres' entitlement to STD benefits after September

---

[6]  The administrative record is not entirely clear as to the original period for which STD benefits were awarded.  The July 31, 2003 letter from MetLife to Ganceres noted August 13, 2003 as an end date for STD benefits.  (A.R. 0010).  The September 23, 2003 letter from MetLife to Ganceres states that Ganceres' STD benefits were denied as of September 23, 2003.  (A.R. 0016).  Dr. Collins' April 15, 2004 medical records report seems to assume that Ganceres' STD benefits had ceased on August 19, 2003, and not on September 23, 2003.  (A.R. 0095-0096).  The May 5, 2004 appeal denial letter states that STD benefits were approved for Ganceres from August 20, 2003 through September 1, 2003, but appropriately terminated thereafter.  (A.R. 0109).  Nevertheless, the critical inquiry for this Court is whether MetLife's decision that Ganceres was not entitled to STD benefits after September 1, 2003 was "wrong."

[7]  Even though Dr. Collins only performed a records review of Ganceres, and did not treat her, it was not improper for MetLife to ascribe weight to her findings.  See Gannon v. Met. Life Ins. Co., 360 F.3d 211, 214 (1st Cir. 2004) ("physician's review of a claimant's file" is "reliable medical evidence" to support denial of benefits); Hightshue v. AIG Life Ins. Co., 135 F.3d 1144, 1148 (7th Cir. 1998) (administrator was entitled to rely on physician's review of claimant's medical file).

-17-

1, 2003, as Dr. Kahn's last visit with Ganceres occurred on August 7, 2003. (A.R. 0030). While the Court understands that Ganceres was experiencing back pain, there is a paucity of medical evidence, if any, suggesting that any resultant disability extended past September 1, 2003. Thus, MetLife's decision to stop STD benefits as of that date was not "wrong."[8]

Moreover, Ganceres' claim that MetLife failed to comply with 29 U.S.C. § 1133(1) because it failed to set forth specific reasons for the denial of her STD benefits is unavailing. The original denial letter, dated September 23, 2003, specifically provides, inter alia, that:

> Your claim is being denied because there is no objective medical evidence to support your absence from work. We received an Attending Physician Statement (APS) to review your claim. It listed a general diagnosis of leg pain. No objective medical evidence was sent to support disability due to a diagnosis of leg pain. Therefore your claim for short-term disability benefits is denied.

(A.R. 0016). The letter also set forth the definition of "Total Disability" under the Plan, thus informing Ganceres that the medical information she provided did not support a finding that her malady fell within that definition. (Id.). The denial letter fully explained Ganceres' right to appeal, informed her how to do so and explained that if her appeal was denied, she could file suit under ERISA.[9] (Id.). MetLife did not violate

---

[8] Therefore, the Court need not further address the proper standard of review under Williams.

[9] In addition to the original denial complying with the applicable notice requirements, the May 5, 2004 appeal denial letter sets forth in significant detail the medical information within the administrative record used to determine Ganceres was no longer entitled to STD benefits after September 1, 2003. (A.R. 0109-0110).

any claims procedures in the manner in which it informed Ganceres of its decision, and sufficiently complied with 29 U.S.C. § 1133(1) and 29 C.F.R. § 2560.503-1(e) - (g) in terminating her STD benefits effective September 1, 2003.

## IV.   CONCLUSION

For the foregoing reasons, the undersigned will not disturb MetLife's decision terminating Ganceres' STD benefits as of September 1, 2003.  Moreover, as set forth in Magistrate Judge Howard's Report and Recommendation regarding Plaintiff's Motion for Finding that She Has Supplied Proof of Eligibility for LTD Benefits, or, Alternatively for Remand (Doc. 40), the determination that Ganceres is not entitled to STD benefits after September 1, 2003 (which is before the expiration of the initial twenty-six week period for which STD benefits are payable) obviates the need to assess Ganceres' entitlement to LTD benefits.  The Plan, when read in toto, is clear that a participant must obtain twenty-six weeks of STD benefits before any entitlement to LTD benefits commences.

Accordingly, it is hereby **ORDERED**:

1.     Defendants Cingular Wireless Health and Welfare Benefit Plan for Non-Bargained Employees and Metropolitan Life Insurance Company's Motion for Final Judgment Based on Review of Administrative Record (Doc. 62) is **GRANTED**. Plaintiff Elisa Ganceres' Motion for Summary Judgment (Doc. 73) is **DENIED**. Judgment shall enter in favor of the defendants and against the plaintiff.

2.     Upon an independent and de novo review of Ganceres' Motion for

Finding that She Has Supplied Proof of Eligibility for LTD Benefits, or, Alternatively for Remand (Doc. 23), Ganceres' Objections to Magistrate Judge Marcia Morales Howard's Report and Recommendation (Doc. 48) are **OVERRULED** and the Report and Recommendation (Doc. 40) is **ADOPTED** as the opinion of the Court.  Thus, Ganceres' Motion for Finding that She Has Supplied Proof of Eligibility for LTD Benefits, or, Alternatively for Remand (Doc. 23) is **DENIED**.

3. The Clerk is Ordered to close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 14th day of September, 2006.

_____
TIMOTHY J. CORRIGAN
United States District Judge

t
Copies:

Honorable Marcia Morales Howard,
United States Magistrate Judge

counsel of record